United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIA PUGH, et al.,

    Plaintiffs,

v.

DOCTORS MEDICAL CENTER, et al.,

    Defendants.

_____/

No. C 08-4159 PJH

**ORDER**

Defendants' motions for summary judgment came on for hearing before this court on March 17, 2010. Plaintiffs appeared by their counsel J. Wynne Herron; defendant Doctors Medical Center appeared by its counsel Aaron T. Schultz and defendant Malcolm Johnson, M.D. appeared by his counsel Theresa A. Dillard and Stephen Schear. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS the motions in part and DENIES them in part.

**BACKGROUND**

In the early morning hours of February 19, 2008, plaintiff Tommie Pugh sought emergency medical care from the emergency room ("ER") of defendant Doctors Medical Center ("DMC"), in Oakland, California. According to hospital medical records, he entered the hospital through the Ambulance Bay at approximately 3:10 a.m., and was accompanied by his wife, Willia Pugh. Mrs. Pugh stated that Mr. Pugh was having a stroke or a heart

attack.

Mr. Pugh was immediately seen by a triage nurse, who noted that Mr. Pugh was able to get out of his vehicle and walk to a waiting wheelchair. At that point, Mr. Pugh complained of burning to his bilateral lower extremities, from the knees down. He stated that he had diabetic neuropathy, and was having toe and knee pain. He told staff to "hurry up," because he wanted some pain medication. On initial assessment by the triage nurse, Mr. Pugh had a blood pressure of 169/87, and a pulse of 106.

Shortly after arrival, Mr. Pugh was examined by defendant Malcolm Johnson, M.D., a contract employee hired by California Emergency Physicians. Mr. Pugh again complained of bilateral lower extremity burning to areas below the knee, which he attributed to neuropathy. Dr. Johnson reported in the record that Mr. Pugh was argumentative and noncompliant, and that he reported a history of hypertension, diabetes, and high cholesterol.

Although Mr. Pugh complained that he could not move his right lower or upper extremities, Dr. Johnson noted that he had walked into the room without difficulty, and that he also used his right hand and arm to remove EKG leads from his chest. Dr. Johnson indicated in the record that Mr. Pugh did not complain of headache or visual loss, and Dr. Johnson did not find on physical examination or by observation that Mr. Pugh was having right-sided or lower extremity weakness. In addition, however, Dr. Johnson testified that it was difficult to examine Mr. Pugh because he was so combative.

Dr. Johnson noted in the chart that Mr. Pugh stated that he did not want the leads on him, and that "all he wanted was to have some methadone." Dr. Johnson reported that Mr. Pugh became upset when he was informed that methadone was not available in the ER. At that point, Mr. Pugh got up from the table and told Dr. Johnson that he wanted to leave. Dr. Johnson tried to keep Mr. Pugh from leaving, but reported that he began cursing and shouting that he wanted to go home and get his methadone, and at one point, shoved Dr. Johnson. Mr. Pugh signed a form verifying that he was leaving against medical advice ("AMA").

Mrs. Pugh (who had been parking their van) then arrived in the ER. She testified that when she first saw Mr. Pugh, he was "standing up naked pulling electrodes off of him," and that when she told Mr. Pugh she would go home and get the methadone, he "started cursing and carrying on some more," which Mrs. Pugh stated was "a complete shock because he doesn't curse." Since Mr. Pugh could not obtain the methadone at DMC, and since he refused to allow Mrs. Pugh to return home and get it herself, she decided that "the only thing . . . to do" was to take him home. She later testified that she was unaware that he had signed an AMA form, and that if she had known that, she would not have left the hospital with him.

The Pughs departed the ER at approximately 3:40 a.m. After Mr. Pugh obtained his methadone at home, and drank it, they got back in the van to return to DMC. Mrs. Pugh drove Mr. Pugh back to DMC, arriving at 4:21 a.m. She testified that during the ride over, Mr. Pugh said that he was feeling weakness in his right side. Once at DMC, Mrs. Pugh requested assistance in taking Mr. Pugh inside. She asserts that Dr. Johnson came out of the ER onto the steps and that two DMC nurses were also present.[1]

According to Mrs. Pugh, she told Dr. Johnson that Mr. Pugh was ready to come back to the hospital, but Dr. Johnson told her that he would not allow Mr. Pugh into the ER, and that if she did not leave he would call the police. Plaintiffs assert that Mrs. Pugh informed Dr. Johnson that Mr. Pugh was manifesting stroke-like symptoms. Dr. Johnson allegedly asked Mrs. Pugh, "How do you know?" and opined that her husband was not having a stroke since he could walk. Dr. Johnson also allegedly told plaintiffs that he was tired of their "shucking and jiving and lying," and, with the assistance of two male nurses employed by DMC, allegedly threatened to have the Pughs arrested for trespassing if they did not leave the hospital area.

For his part, Dr. Johnson states that he took three or four steps out of the

---

[1] Mr. Pugh testified in his deposition that he blacked out on the way back to DMC, and had no recollection of anything that happened once they arrived at the hospital. He stated that he did not recall anything that happened from that time until one month after the incident.

3

Emergency Department entrance toward the Pughs' vehicle, but did not approach the van, or see who was in it. He concedes having spoken with Mrs. Pugh, but maintains that Mrs. Pugh did not want or request care or treatment, and that she wanted to take Mr. Pugh to another facility. Dr. Johnson denies that he ever argued with Mrs. Pugh or that he refused to treat Mr. Pugh.

In any event, Mrs. Pugh determined to take Mr. Pugh to another facility. She testified that she asked Mr. Pugh whether he wanted to go to Alta Bates or to Kaiser, and Mr. Pugh responded, "Alta Bates." Alta Bates is located approximately 25-30 minutes away from DMC. Ms. Pugh testified that during the drive from DMC to Alta Bates, Mr. Pugh "kind of went out." They arrived at Alta Bates at approximately 5:10 a.m.

The medical records indicate that upon evaluation in the ER at Alta Bates, Mr. Pugh was alert, awake, and oriented. He was grossly nontoxic appearing, other than some mild slurred speech and difficulty moving the right side of his body. A CT scan of his head showed a 2.4 cm left thalamic and basal ganglia hemorrhage with some mild edema. A neurological evaluation concluded that no surgical intervention was required. Mr. Pugh was admitted to the ICU for further treatment. On March 14, 2008, Mr. Pugh was transferred from Alta Bates to Shields Nursing Center for subacute treatment.

Plaintiffs filed the present action on September 3, 2008. On December 17, 2008, plaintiffs filed a first amended complaint ("FAC"), asserting three causes of action. First, Tommie Pugh alleges a claim of negligence per se, based on alleged violation of the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. §§ 1395dd, et seq. ("EMTALA") against DMC. Second, Tommie Pugh asserts a claim of violation of the Unruh Civil Rights Act, California Civil Code § 51 ("Unruh Act"), against DMC and Dr. Johnson, alleging that they discriminated against him based on a perception that he was engaged in "drug-seeking behavior." Third, Willia Pugh asserts a claim of intentional inflection of emotional distress against Dr. Johnson.

Both DMC and Dr. Johnson now seek summary judgment as to the claims asserted against them.

4

**DISCUSSION**

A.     Legal Standard

Summary judgment is appropriate when there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Material facts are those that might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Southern Calif. Gas. Co. v. City of Santa Ana, 336 F.3d 885, 888 (9th Cir. 2003).

On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 324-25. If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. See Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 250.

B.     Defendants' Motions

DMC argues that summary judgment should be granted on the first cause of action for negligence per se because plaintiffs cannot establish that the alleged EMTALA violations caused Mr. Pugh's injuries. DMC also contends that summary judgment should be granted as to the Unruh Act claims asserted against it because Dr. Johnson's decision not to admit Mr. Pugh was based on his prior conduct, not on his appearance, and because DMC itself did not deny entry or services to Mr. Pugh.

Dr. Johnson argues that summary judgment should be granted as to the Unruh Act

5

claim because Mr. Pugh cannot show that Dr. Johnson intentionally discriminated against him, and cannot establish that Dr. Johnson's alleged conduct caused his alleged damages. Dr. Johnson also asserts that Mrs. Pugh's claim of intentional infliction of emotional distress fails because she cannot prove the elements of the claim.

        1.      EMTALA claim

DMC argues that summary judgment should be granted as to the first cause of action for negligence per se because plaintiffs cannot establish that the alleged EMTALA violation caused Mr. Pugh's injuries. EMTALA imposes two duties on hospital emergency rooms. First, the hospital must conduct an "appropriate medical screening within the capability of the hospital's emergency department." 42 U.S.C. § 1395dd(a). Second, if the hospital detects an emergency condition, it must stabilize the patient before transferring or discharging him. See 42 U.S.C. § 1395dd(b), (c); Jackson v. East Bay Hosp., 246 F.3d 1248, 1254-55 (9th Cir. 2001). Any person who suffers personal harm as a result of a hospital's violation of its duties under EMTALA is authorized to file a civil claim. 42 U.S.C. § 1395dd(d)(2)(1).

In the first cause of action, Mr. Pugh alleges that he presented at DMC for treatment, and that he was turned away without being evaluated, in violation of 42 U.S.C. § 1395dd(a). He then went to Alta Bates, a nearby hospital, where he was diagnosed with a brain hemorrhage. He claims injuries from the alleged failure by DMC to examine and treat him. However, rather than asserting a claim under 42 U.S.C. § 1395dd(d)(2)(a), Mr. Pugh asserts the claim as a claim of negligence per se.

The negligence per se doctrine does not establish a cause of action distinct from negligence. California Serv. Station & Auto. Repair Ass'n v. American Home Assur. Co., 62 Cal. App. 4th 1166, 1178 (1998) ("[A]n underlying claim of ordinary negligence must be viable before the presumption of negligence of Evidence Code section 669 can be employed.").

Rather, the negligence per se doctrine treats a statutory violation as evidence of negligence. It is the tort of negligence, not the violation of the statute itself, which entitles

6

the plaintiff to recover civil damages. Under such circumstances, the plaintiff is not pursuing a private cause of action for violation of statute, but rather is pursuing a negligence action and is relying on the violation of the statute, ordinance, or regulation to establish part of that cause of action. See Sierra-Bay Fed. Land Bank Assn. v. Superior Court, 227 Cal. App. 3d 318, 333 (1991).

To establish a claim of negligence per se, a plaintiff must prove that the defendant violated a statute, ordinance, or regulation; that the violation proximately caused death or injury to person or property; that the death or injury resulted from an occurrence the nature of which the statute, ordinance, or regulation was designed to prevent; and that the person suffering the injury was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted. Cal. Evid. Code § 669(a); Alcala v. Vazmar Corp., 167 Cal. App. 4th 747, 755 (2008).

Thus, DMC argues, under the requirements of both EMTALA and the doctrine of negligence per se, in order for Mr. Pugh to recover based on a violation of EMTALA by DMC, he must prove that the alleged violation caused his injuries. DMC asserts, however, that Mr. Pugh has no evidence sufficient to establish a causal relationship between DMC's alleged conduct and his injuries.

Both of DMC's medical experts – Bruce T. Adornato, M.D., and Elliot S. Nipomnick, M.D. – state in their declarations that the failure to admit Mr. Pugh to DMC's ER when he returned to the hospital for the second time did not cause or contribute to Mr. Pugh's eventual neurologic injuries or outcome.

Dr. Adornato states that there are only a few treatment options to address a cerebral hemorrhage of the type suffered by Mr. Pugh. One of the few interventions is manipulation of blood pressure, but this type of treatment can further damage the tissue surrounding the hematoma, particularly in patients with chronic hypertension, such as Mr. Pugh. Thus, Dr. Adornato asserts, based on hospital records, Mr. Pugh's blood pressure was not high enough to warrant this type of treatment. Other than managing blood pressure, surgery may be an option. However, according to Dr. Adornato, several trials of surgery for

7

cerebral hemorrhage have failed to show a reliable benefit of the intervention, and the surgery carries with it a serious risk of further brain injury, or even death.

Moreover, both Dr. Adornato and Dr. Nipomnick agree that DMC does not have a neurosurgery department, and that even if surgery had been an appropriate treatment option, it would have been necessary in any event to transfer him to a hospital (such as Alta Bates) that has the ability, if necessary, to perform surgery to address a cerebral hemorrhage condition.

Plaintiffs concede that Mr. Pugh does not have evidence sufficient to support that the failure to admit him caused his physical injuries.[2] They argue, however, that Mr. Pugh suffered emotional distress damages as a result of being denied treatment. They concede that Mr. Pugh has only "vague recollections" of events concerning the second visit to DMC, and has stated that he did not recall anything at all until more than a month after the incident. However, plaintiffs contend that Mr. Pugh's loss of memory regarding the events is relevant to the nature and extent of any emotional distress damages he has suffered, not to the question whether he suffered emotional distress at the time.

In reply, DMC asserts that this damages argument is essentially a claim for negligent infliction of emotional distress, a claim that was not pled in the FAC. In addition, DMC notes, the FAC nowhere alleges that Mr. Pugh suffered emotional distress damages as a result of DMC's violation of EMTALA – but rather, that the failure of DMC to treat Mr. Pugh's cerebral hemorrhage caused him to sustain physical injury, which in turn caused him mental and physical pain and suffering. DMC asserts that a claim for pain and suffering resulting from physical injury is fundamentally different from a claim for negligent infliction of emotional distress, and that, in any event, a plaintiff in a personal injury action generally cannot recover general damages (or damages of any kind) where he cannot

---

[2] Plaintiffs also contend that an EMTALA claim may be asserted not only by the person who was denied treatment, but also by a person accompanying them, if in a special relationship such as a spouse or relative. The court notes, however, that the FAC alleges that the first cause of action is brought by Mr. Pugh alone. Thus, the question of Mrs. Pugh's standing to sue for a violation of EMTALA is not at issue.

8

prove that he suffered physical injury as a result of the alleged conduct.

In addition, DMC contends that plaintiffs have provided no evidence to support Mr. Pugh's claim that the denial of service caused him to suffer serious emotional distress. DMC notes that Mr. Pugh concedes that he has no memory of being denied service at DMC, and that Mrs. Pugh testified that Mr. Pugh was for the most part unconscious during the drive from DMC to Alta Bates. DMC notes further that neither of the Pughs has offered any evidence that Mr. Pugh was making any statements or exhibiting any conduct during the drive between the two hospitals that would demonstrate that he was suffering from serious emotional distress because of having been denied service.

The court finds that the motion must be GRANTED as to any damages relating to Mr. Pugh's alleged physical injuries. The court finds further, however, that triable issues remain regarding whether Mr. Pugh suffered emotional distress, and the extent of any such emotional distress. As for DMC's argument regarding the failure to plead a cause of action for negligent infliction of emotional distress, and the distinction between a claim for pain and suffering resulting from physical injury, and a claim for negligent infliction of emotional distress, the court notes that DMC failed to make this argument in its moving papers. The first cause of action asserts a claim of negligence per se, based on an alleged violation of EMTALA, and alleges that DMC's negligence caused Mr. Pugh "to sustain injury to his body, psyche, and nervous system, all of which have caused and continue to cause [p]laintiff mental and physical pain and suffering . . . " FAC ¶ 25. Thus, Mr. Pugh is seeking to recover general damages in the form of pain and suffering, which he claims he incurred as a result of DMC's negligence.

DMC's argument that Mr. Pugh cannot recover general damages for mental suffering in the absence of proof that he suffered physical injury is unsupported by persuasive authority. It is true that general damages may be awarded in the form of emotional distress called pain and suffering where it is a natural concomitant of a physical injury. Duarte v. Zachariah, 22 Cal. App. 4th 1652, 1664 (1994). Under California law, however, a plaintiff may also recover damages for emotional distress even if he did not

suffer physical injury.  See, e.g., Lee v. Bank of America, 218 Cal. App. 3d 914, 920-21 (1990) ("damages for emotional distress unaccompanied by physical injury may be awarded in a tort action"); see also Molien v. Kaiser Foundation Hospitals, 27 Cal. 3d 916, 928 (1980) ("unqualified requirement of physical injury is no longer justifiable"); Flahavan, Rea & Kelly, Cal. Practice Guide: Personal Injury (2009 ed.) § 3:212.1.

Nevertheless, in order to recover damages in this case, Mr. Pugh must establish that he suffered "severe" emotional distress.  Lee, 218 Cal. App. 3d at 920 (while damages for emotional distress unaccompanied by physical injury may be awarded in a tort action, the injury suffered must be severe, i.e., "substantial or enduring as distinguished from trivial or transitory;" moreover, California courts have limited emotional suffering damages to cases involving either physical impact and injury to plaintiff or intentional wrongdoing by defendant).

Evidence showing that the plaintiff was simply "angry" or "disturbed" does not suffice.  Potter v. Firestone Tire & Rubber Co., 6 Cal. 4th 965, 1004 (1993); see also Lee, 218 Cal. App. 3d at 920 (rejecting bank customer's intentional infliction claim for wrongful dishonor of checks; "severe" distress not substantiated merely by allegation of "subjective state of discomfort"); Paulson v. State Farm Mut. Auto. Ins. Co., 867 F.Supp. 911, 919 (C.D. Cal. 1994) (no recovery under California law based on allegations of "frustration, depression, nervousness and anxiety" for which plaintiff never sought medical care).

Finally, although this issue was not briefed by the parties, the court notes that Mr. Pugh may have difficulty prevailing on the first cause of action, because it is pled as a claim of negligence per se, rather than as a claim under EMTALA.  Negligence per se is a common law doctrine that has been codified in California as a rebuttable presumption of negligence.  See Cal. Evid. Code § 669.  Under § 669, the failure of a person to exercise due care is presumed if (1) he violated a statute, ordinance, or regulation of a public entity; (2) the violation proximately caused death or injury to person or property; (3) the death or injury resulted from an occurrence of the nature of which the statute, ordinance, or regulation was designed to prevent; and (4) the person suffering the death or injury to his

10

person or property was one of a class of persons for whose protection the statute, ordinance, or regulation was adopted.

Negligence per se is not a separate tort giving rise to civil damages liability for a statutory violation; rather, an underlying claim of ordinary negligence must be viable before the § 669 presumption of negligence can arise. Millard v. Biosources, Inc., 156 Cal. App. 4th 1338, 1353 & n.2 (2007); Quiroz v. Seventh Ave. Ctr., 140 Cal. App. 4th 1256, 1285 (2006). Thus, it must appear that the statute (or ordinance or regulation) at issue was intended to create a duty of care, the violation of which could be the basis for a negligence per se instruction. See Rosales v. City of Los Angeles, 82 Cal. App. 4th 419, 430 (2000); Wawanesa Mut. Ins. Co. v. Matlock, 60 Cal. App. 4th 583, 585-87 (1997).

Congress enacted EMTALA "to create a new cause of action, generally unavailable under state tort law, for what amounts to failure to treat" and not to "duplicate preexisting legal protections." Bryant v. Adventist Health System/West, 289 F.3d 1162, 1168-69 (9th Cir. 2002). EMTALA is designed to provide a remedy for those patients whom a hospital "dumped," that is those whom a hospital turned away without first providing an examination or those whom the hospital transferred without stabilizing an emergency medical condition. See Jackson, 246 F.3d at 1256; Brooks v. Maryland Gen'l Hosp., Inc., 996 F.2d 708, 710 (4th Cir. 1993).

EMTALA is not a substitute for state law actions for professional negligence, "and was not intended to guarantee proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence." Power v. Arlington Hosp. Ass'n, 42 F.3d 851, 856 (4th Cir. 1994); see Baker v. Adventist Health, Inc., 260 F.3d 987, 993 (9th Cir. 2001). Nor was EMTALA intended "to create a negligence standard based on each hospital's capability." Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 21 (1st Cir. 2002); Baber v. Hospital Corp. of Am., 977 F.2d 872, 880 (4th Cir. 1992).

Here, plaintiffs allege a claim of failure to screen, as opposed to a claim of negligent screening. However, as noted above, in order for the § 669 presumption of negligence to arise, there must be a viable underlying claim of ordinary negligence. Numerous federal

11

courts have indicated that an EMTALA claim is not equivalent to a state "malpractice" or "professional negligence" claim. See Jackson, 246 F.3d at 1256 (statutory language of EMTALA clearly declines to impose on hospitals a national standard of care in screening patients); Eberhardt v. City of Los Angeles, 62 F.3d 1253, 1258 (9th Cir. 1995) (same); see also Agosto, 299 F.3d at 21; Battle v. Memorial Hosp. at Gulfport, 228 F.3d 544, 557 (5th Cir. 2000); Summers v. Baptist Med. Ctr., 91 F.3d 1132, 1137-38 (8th Cir. 1996); Baber, 977 F.2d at 879-80; Gatewood v. Washington Healthcare Corp., 933 F.2d 1037, 1041 (D.C. Cir. 1991); Cleland v. Bronson Health Care Group, 917 F.2d 266, 272 (6th Cir. 1990).

### 2. Unruh Act claim

Both DMC and Dr. Johnson seek summary judgment as to the Unruh Act claims. DMC contends that summary judgment should be granted because Dr. Johnson's decision not to admit Mr. Pugh was based on his prior conduct, not on his appearance, and because DMC itself did not deny entry or services to Mr. Pugh. Dr. Johnson argues that summary judgment should be granted because Mr. Pugh cannot show that Dr. Johnson intentionally discriminated against him, and cannot establish that Dr. Johnson's alleged conduct caused his alleged damages.

The Unruh Act provides, in relevant part, that

> [a]ll persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

Cal. Civ. Code § 51(b). A plaintiff who proves a claim under the Unruh Act is entitled to all "actual damages" (special and general damages) caused by the discrimination. See Cal. Civ. Code § 52(a), (h).

The Act seeks to protect not only the enumerated category of protected classes, but also all persons from any arbitrary discrimination by a business establishment. See Marina Point, Ltd. v. Wolfson, 30 Cal. 3d 721, 732-36 (1982). The protected classifications have expanded to include persons with unconventional dress or physical appearance, families

12

with children, homosexuals, and persons under age 18.  See <u>Scripps Clinic v. Superior Court</u>, 108 Cal. App. 4th 917, 932 (2003).  However, while the Unruh Act seeks to remedy arbitrary discrimination, "[i]t does not seek to remedy traditional wrongs arising out of tort or breach of contract, or discrimination based on purely personal grounds."  <u>Frantz v. Blackwell</u>, 189 Cal. App. 3d 91, 96 (1987).

In the third cause of action under the Unruh Act claim, plaintiffs allege that DMC is a business establishment within the meaning of the Unruh Act, and that DMC and Dr. Johnson violated Mr. Pugh's rights by denying him access to DMC's emergency room.  DMC argues that it is entitled to summary judgment on this claim because plaintiffs have conceded that Mr. Pugh was denied service because of his behavior, not his appearance, and have provided no evidence showing that he was denied service because of his membership in a protected class.

DMC also asserts that plaintiffs have provided no evidence that DMC itself denied service – as opposed to Dr. Johnson, an independent contractor provided by California Emergency Physicians to serve as an ER physician at DMC.  DMC contends that even if plaintiffs were able to provide some evidence that Dr. Johnson unlawfully discriminated against Mr. Pugh, there is absolutely no evidence that any employee of DMC barred Mr. Pugh's access.

For his part, Dr. Johnson argues that he is entitled to summary judgment on this claim because plaintiffs cannot prove that he intentionally discriminated against Mr. Pugh, and cannot show any causal connection between the alleged discriminatory conduct and the alleged damages.  Dr. Johnson asserts that the only evidence to support Mr. Pugh's claim of intentional discrimination is the assertion by Mr. and Mrs. Pugh that Dr. Johnson discriminated against them because they exhibited "drug-seeking behavior" and "street person" appearances.

However, Dr. Johnson expressly denies discriminating against Mr. Pugh, and notes that he testified in his deposition that they exhibited none of the signs of homelessness, as they drove a van, returned "home" to get Mr. Pugh's methadone, and were appropriately

dressed and apparently educated. Dr. Johnson claims that on the Pughs' first visit, after he told Mr. Pugh that the ER did not have methadone available, he offered Mr. Pugh some alternative pain medication, but that Mr. Pugh declined and insisted on leaving the ER against medical advice, to return home to retrieve his methadone. Dr. Johnson contends that the fact that he offered Mr. Pugh pain medication runs counter to the claim that he discriminated against Mr. Pugh for his "drug-seeking behavior."

Dr. Johnson notes that he had previously treated Mr. Pugh, in December 2007, and that his willingness to treat him a second time proves that he was not discriminating against him based on any behavior or conduct. Dr. Johnson states in his declaration that he has a long history of treating homeless, drug-addicted, and indigent individuals at DMC, and at another hospital, and that he in fact chose to work at DMC in order to serve the impoverished minority community near DMC. Thus, Dr. Johnson argues, even if he turned Mr. Pugh away when the Pughs returned to the hospital, Mr. Pugh cannot establish that the refusal to treat Mr. Pugh was an intentional act of discrimination.

Dr. Johnson also contends that plaintiffs cannot show any causal relationship between Mr. Pugh's alleged injuries and the alleged denial of medical treatment, and that the evidence in fact shows Mr. Pugh's physical injuries were not caused by the delay in treatment. In his own declaration, Dr. Johnson states that as of the date of this incident, DMC did not have a neuro-surgical unit (and that it still has no such unit). Had Dr. Johnson admitted Mr. Pugh, and had he concluded that Mr. Pugh had a basil ganglia hemorrhage (as was determined at Alta Bates), then it would have been necessary to transfer Mr. Pugh to a hospital (such as Alta Bates) which does have a neuro-surgical unit. Dr. Johnson estimates, based on his own experience in facilitating such transfers, that it would have taken three to four hours to accomplish that transfer.

Dr. Johnson's expert, Lawrence Shuer, M.D., who is board-certified in neurosurgery, states in his declaration that based on his review of the medical records pertaining to Mr. Pugh's admission to both DMC and Alta Bates, he concludes (1) that when Mr. Pugh first presented to DMC at approximately 3:10 a.m., he had no focal neurological deficits, and his

primary symptom was burning pain in the legs, and (2) that when Mr. Pugh presented to Alta Bates for treatment at approximately 5:07 a.m., he was admitted and diagnosed with a basal ganglia hemorrhage, which, in Dr. Shuer's opinion (and the opinion of the treating physicians at Alta Bates), was non-operable.

      Dr. Shuer states that the usual treatment is to administer medication to try to lower the patient's blood pressure, but that even if that treatment is successful, it cannot lessen the severity of the hemorrhage or the resulting physical symptoms. Thus, in Dr. Shuer's opinion, there was no treatment that could have been provided to Mr. Pugh at DMC that could have changed his outcome; and further, nothing that Dr. Johnson did or failed to do caused or contributed in any way to any alleged physical injury suffered by Mr. Pugh. Dr. Shuer concurs with Dr. Johnson's assessment of the amount of time that would have been required to effectuate a transfer from DMC to Alta Bates.[3]

      Dr. Johnson asserts further that Mr. Pugh cannot claim any emotional distress damages arising from the alleged denial of services because, by his own account, he was "blacked out" during his second visit to DMC, and because there is no evidence that Dr. Johnson ever saw Mr. Pugh during this second visit.

      In opposition, plaintiffs assert that Dr. Johnson's motivation for refusing to treat Mr. Pugh is a factual issue that should be resolved by the trier of fact. They contend that it is likely that Dr. Johnson was upset and angry at Mr. Pugh both because he left the ER on the first occasion against medical advice, and because he did so in order to retrieve his methadone. They contend that the videotaped film of the Ambulance Entrance on the night in question shows that Dr. Johnson, contrary to his deposition testimony, did in fact move beyond the entrance to the ER and did in fact approach the Pughs' vehicle and speak to Mrs. Pugh.

---

[3] As noted above with regard to the EMTALA claim, both of DMC's medical experts – Dr. Adornato and Dr. Nipomnick – concur with the opinion that the failure to admit Mr. Pugh into the ER at DMC did not have any impact on Mr. Pugh's injuries, and in fact likely allowed Mr. Pugh to be treated at a hospital with a neurology department more quickly than would have otherwise been the case.

15

With regard to the issue of the causal connection between the alleged denial of treatment and Mr. Pugh's damages, plaintiffs concede that the alleged denial of treatment did not affect the outcome of Mr. Pugh's cerebral hemorrhage. Plaintiffs argue, however, that even though there is insufficient evidence to show that Dr. Johnson's conduct changed or worsened Mr. Pugh's condition, that does not mean that it did not cause any damage. Plaintiffs assert that the denial of treatment caused both plaintiffs severe emotional distress, which is cognizable under the Unruh Act.[4]

The court finds that the motions must be GRANTED. With an exception not relevant here, proof of intentional discrimination is necessary to establish a violation of the Unruh Act. Harris v. Capital Growth Investors XIV, 52 Cal. 3d 1142, 1175 (1991); see also Munson v. Del Taco, Inc., 46 Cal. 4th 61, 664-65 (2009). In addition, the California Supreme Court has held that the Unruh Act prohibits only "arbitrar[y]" discrimination based upon an individual's class membership. In re Cox, 3 Cal. 3d 205, 217 (1970). Plaintiffs have neither established that DMC or Dr. Johnson intentionally discriminated against Mr. Pugh within the meaning of the Unruh Act – that is, based on Mr. Pugh's membership in a protected class – nor provided evidence sufficient to raise a triable issue with regard to those elements of the claim.

In particular, plaintiffs have not established that a denial of service based on prior conduct (when service was in fact provided) qualifies as discrimination based on membership in a class. While the Unruh Act does not permit a business enterprise to exclude an entire class of individuals on the basis of a generalized prediction that the class "as a whole" is more likely to commit misconduct than some other class of the public, an individual "may forfeit his statutory right of access to the services of a business enterprise if he conducts himself improperly or disrupts the operations of the enterprise." Marina Point, 30 Cal. 3d at 738-39.

Here, in addition to providing no evidence that Mr. Pugh was a member of a

---

[4] The court notes, however, that the Unruh Act claim is brought only by Tommie Pugh, not by both plaintiffs.

16

1  protected class of any sort, plaintiffs provide no evidence that the failure to treat Mr. Pugh
2  was based on membership in any class, in view of the fact that he <u>was</u> treated on his first
3  visit to DMC.

   3.  Intentional infliction of emotional distress claim

   Dr. Johnson asserts that the third cause of action for intentional infliction of emotional distress fails because Willia Pugh cannot prove the elements of the claim. The elements of a cause of action for intentional infliction of emotional distress are (1) extreme and outrageous conduct by the defendant; (2) extreme or severe emotional distress to the plaintiff; and (3) actual and proximate causation between the two. <u>Potter</u>, 6 Cal. 4th at 1001.

   Dr. Johnson contends that Willia Pugh cannot establish that he engaged in "extreme and outrageous conduct." He asserts that Mrs. Pugh's only evidence in support of this element is her testimony that he told her he was tired of her "shucking, jiving, and lying" and that he raised his voice and said he would call the police if she and her husband did not leave the hospital.

   Dr. Johnson denies that this conversation occurred, but also contends that even if true, these alleged comments would be insufficient to support a claim of intentional infliction of emotional distress because they were not so extreme as to "exceed all bounds of that usually tolerated in a civilized community," as required by the California Supreme Court in <u>Potter</u>. Dr. Johnson asserts that merely standing in front of a doorway and speaking to someone is not conduct that meets this standard, and that Mrs. Pugh therefore cannot prove that the alleged conduct was extreme and outrageous.

   In his reply brief, Dr. Johnson adds that Mrs. Pugh also cannot show that he intended to cause either her or her husband emotional distress, or that he acted with reckless disregard of the likelihood of causing emotional distress. Dr. Johnson claims that he had no motive to inflict emotional distress on either of the Pughs, and that Mrs. Pugh has not provided any evidence to the contrary.

   The court finds that the motion must be DENIED. Triable issues remain as to, <u>e.g.</u>,

the content of the conversation between Mrs. Pugh and Dr. Johnson, whether he actually refused treatment to Mr. Pugh, and whether he acted with the intent to cause emotional distress.[5]

**CONCLUSION**

In accordance with the foregoing, defendants' motions are GRANTED in part and DENIED in part. Dr. Johnson's objections to evidence are SUSTAINED. Moreover, the court did not rely on the disputed evidence in reaching its decision.

**IT IS SO ORDERED.**

Dated: March 22, 2010

PHYLLIS J. HAMILTON
United States District Judge

---

[5] In the opposition, plaintiffs assert that even if the court were to find insufficient evidence of intent to cause emotional distress, they should be permitted to proceed on a theory of negligent infliction of emotional distress. They contend that they plan on requesting at the pre-trial conference that a negligent infliction of emotional distress claim be allowed in this case. This order does not address any issue with regard to a purported claim of negligent infliction of emotional distress, as no such claim was pled in the FAC.