UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIA PUGH, et al.,

        Plaintiffs,

        v.

DOCTORS MEDICAL CENTER, et al.,

        Defendants.
_____/

No. C 08-4159 PJH

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND SETTING FURTHER CASE MANAGEMENT CONFERENCE**

        Before the court is the motion of defendant Doctors Medical Center ("DMC") for summary judgment. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, the court hereby GRANTS the motion.

## BACKGROUND

        The background facts are as stated in the March 22, 2010 order granting in part and denying in part defendants' motions for summary judgement. Briefly, plaintiff Tommie Pugh was seen at the emergency room at DMC by defendant Dr. Malcolm Johnson in the early morning hours of February 19, 2008. Mr. Pugh's wife, plaintiff Willia Pugh, had driven him there after he began complaining of pain.

        Once at DMC, Mr. Pugh requested methadone for his pain. When Dr. Johnson told him the emergency room had no methadone, Mr. Pugh refused to remain at the hospital, despite being given medical advice to do so. He insisted on returning home, where he had some methadone. Although his wife offered to go home and retrieve the methadone, Mr. Pugh would not agree. According to Dr. Johnson, Mr. Pugh became disruptive, but did sign a form indicating that he was leaving the hospital against medical advice.

After they returned home and Mr. Pugh took the methadone, Mrs. Pugh drove Mr. Pugh back to DMC, because she believed Mr. Pugh was having a stroke. Mr. Pugh testified in his deposition that after he drank the methadone, he "blacked out," and that he had no recollection of any events that occurred during the next few weeks – until "a month or so later when I came to."

In her deposition, Mrs. Pugh testified that upon arriving at DMC, she saw two ambulance attendants sitting outside the emergency room entrance. She told them that she had returned with Mr. Pugh, and the attendants went inside. She assumed they were going for a wheelchair, and returned to the vehicle. However, the attendants did not return. Instead, Dr. Johnson came outside with two individuals dressed in green.

Mrs. Pugh got out of the vehicle, and approached Dr. Johnson. She testified that Dr. Johnson refused to allow Mr. Pugh to enter the hospital. She then returned to the vehicle and asked Mr. Pugh (who had remained in the vehicle the entire time) whether he wanted to go to Kaiser or to Alta Bates. He responded, "Alta Bates."

The drive to Alta Bates lasted 20-30 minutes, and Mrs. Pugh testified that during that time, Mr. Pugh "kind of went out" and "wasn't saying or doing anything." The two did not converse during the drive from DMC to Alta Bates. Mrs. Pugh testified that during the drive, when she looked over at Mr. Pugh, he appeared to be "completely out of it."

In a declaration submitted in opposition to the present motion, Mrs. Pugh states that during the drive, Mr. Pugh was "making moaning noises and some incoherent words," and that she "tried talking to him to keep him from becoming disoriented." According to this account, Mr. Pugh "stopped responding around the University Avenue overpass." She became concerned that perhaps he had died. However, she states, when they arrived at Alta Bates at around 5:10 a.m., Mr. Pugh "regained consciousness as they moved him from the van," and said, "'They'll help me.'"

Once at Alta Bates, Mr. Pugh could not recall the emergency room visit to DMC, but did recall some use of recreational drugs earlier the previous evening. He also responded to numerous questions by the emergency room physician concerning the onset of his

symptoms, their nature and extent, and some of the other events that had transpired earlier. The treating physician did not make any notes indicating that Mr. Pugh seemed to be in any apparent emotional distress. Mr. Pugh testified in his deposition that he now has no recollection of any of the events that occurred during the second visit to DMC, or at Alta Bates.

The medical records indicate that upon evaluation in the ER at Alta Bates, Mr. Pugh was alert, awake, and oriented. He was grossly nontoxic appearing, other than some mild slurred speech and difficulty moving the right side of his body. A CT scan of his head showed a 2.4 cm left thalamic and basal ganglia hemorrhage with some mild edema. A neurological evaluation concluded that no surgical intervention was required. However, Mr. Pugh was admitted to the ICU for further treatment. Approximately three weeks later, on March 14, 2008, he was transferred from Alta Bates to Shields Nursing Center for subacute treatment.

Plaintiffs filed the present action on September 3, 2008, alleging three causes of action: (1) a claim of negligence per se, asserted by Tommie Pugh against DMC, based on a violation of the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. §§ 1395dd, et seq. ("EMTALA") against DMC; (2) a claim under the Unruh Civil Rights Act, California Civil Code § 51 ("Unruh Act"), asserted by both Tommie and Willia Pugh against DMC and Dr. Johnson; and (3) a claim of intentional inflection of emotional distress, asserted by Willia Pugh against Dr. Johnson. Plaintiffs subsequently stipulated to a dismissal of Willia Pugh's claim under the Unruh Act.

On December 11, 2008, at the initial case management conference, the court set a non-expert discovery cut-off date of December 2, 2009; a January 4, 2010 deadline to disclose experts; a dispositive motions hearing deadline of January 20, 2010; and a trial date of May 10, 2010.

On December 17, 2008, plaintiffs filed a first amended complaint, asserting the same three causes of action as in the original complaint. On December 8, 2009, six days after the close of non-expert discovery, plaintiffs' attorney filed a motion for leave to withdraw as

counsel, set for hearing on January 13, 2010. On December 16, 2009, both defendants filed motions for summary judgment. On January 7, 2010, the court granted the parties' request to continue the hearing on the motions for summary judgment and extending the time to file the opposition. On January 13, 2010, the court granted plaintiffs' counsel's motion for leave to withdraw, and approved the substitution of new counsel.

On January 21, 2010, the court conducted a further case management conference, at which time plaintiffs' new counsel requested a continuance of the discovery cutoff dates, expert disclosure dates, and hearing date on pending motions for summary judgment. In an order filed January 25, 2010, the court denied the request to reopen discovery and the pleadings, on the ground that the deadlines had already passed and plaintiffs had not established good cause for the request. However, the court did grant plaintiffs an additional 30 days to oppose the motions for summary judgment. The court also continued the pretrial conference date.

In the March 22, 2010 summary judgment order, the court dismissed the Unruh Act claim, but denied Dr. Johnson's motion as to the intentional infliction of emotional distress claim. As for the negligence per se claim against DMC, the court granted the motion insofar as Mr. Pugh was seeking damages based on physical injuries, and denied it insofar as he was seeking damages for emotional distress. Not only did DMC's medical experts establish that the failure to admit Mr. Pugh to DMC's ER when he returned to the hospital did not cause or contribute to Mr. Pugh's eventual neurologic injuries, but plaintiff, having failed to designate any medical expert, presented no evidence to the contrary. In the order the court also noted that the pleading of the EMTALA claim as a claim of negligence per se was problematic, as an EMTALA violation does not give rise to a negligence claim, and Mr. Pugh had alleged no other viable underlying claim of negligence.

Also on March 22, 2010, because of a conflict in the court's schedule, the trial date was advanced, to May 3, 2010. With their pretrial papers, plaintiffs filed a motion for leave to amend the complaint, to be heard at the pretrial conference. At the pretrial conference, the court denied the motion for leave to amend because it was untimely and granting it

4

would prejudice defendants who would have no opportunity to move for summary judgment in view of the imminent trial date. Plaintiffs were ordered however to file a response to DMC's trial brief to assist the court in determining how the negligence per se claim should be presented to the jury.

After reviewing the supplemental trial brief and the proposed jury instructions submitted by the parties, the court ordered additional supplemental briefing regarding a number of issues, including the status of the negligence per se/EMTALA claim. Because the jury instructions for that claim as pleaded were nonsensical, the court vacated the trial date and decided to permit plaintiffs to amend the complaint to remove the negligence per se claim and to plead a straight EMTALA claim. In order to alleviate the prejudice to defendants, the court set a briefing schedule for a further motion for summary judgment to be filed by DMC.

In the second amended complaint ("SAC"), plaintiffs allege two causes of action – a claim for violation of EMTALA, asserted by Tommie Pugh against DMC; and a claim of intentional infliction of emotional distress, asserted by Willia Pugh, against Dr. Johnson. Tommie Pugh has conceded that he has no basis for alleging that he suffered any physical injuries as a result of the EMTALA violation. He therefore seeks only emotional distress damages.

DMC now seeks summary judgment on the EMTALA claim.

## DISCUSSION

A.  Legal Standard

Summary judgment is appropriate when there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Material facts are those that might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery

5

1 responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp.
2 v. Catrett, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof
3 at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other
4 than for the moving party. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 994 (9th Cir.
5 2007).

6 On an issue where the nonmoving party will bear the burden of proof at trial, the
7 moving party can prevail merely by pointing out to the district court that there is an absence
8 of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 324-25. If the
9 moving party meets its initial burden, the opposing party must then set forth specific facts
10 showing that there is some genuine issue for trial in order to defeat the motion. See Fed.
11 R. Civ. P. 56(e); Anderson, 477 U.S. at 250.

12 B.   DMC's Motion

13 DMC concedes that even though Tommie Pugh asserts only emotional distress
14 damages under the EMTALA claim, he will be entitled to recover if there is sufficient
15 evidence of severe emotional distress. In the present motion, DMC argues that summary
16 judgment should be granted because Mr. Pugh lacks sufficient evidence of severe
17 emotional distress suffered as a result of DMC's alleged violation of EMTALA.

18 EMTALA imposes two duties on hospital emergency rooms. First, the hospital must
19 conduct an "appropriate medical screening within the capability of the hospital's emergency
20 department." 42 U.S.C. § 1395dd(a). Second, if the hospital detects an emergency
21 condition, it must stabilize the patient before transferring or discharging him. See 42 U.S.C.
22 § 1395dd(b), (c); Jackson v. East Bay Hosp., 246 F.3d 1248, 1254-55 (9th Cir. 2001).

23 Any person who suffers personal harm as a result of a hospital's violation of its
24 duties under EMTALA is authorized to file a civil claim. 42 U.S.C. § 1395dd(d)(2)(A).
25 However, the claim may be asserted only against the hospital; EMTALA does not provide a
26 private cause of action against individual physicians. See Eberhardt v. City of Los Angeles,
27 62 F.3d 1253, 1256-57 (9th Cir. 1995).

28 Under EMTALA, a plaintiff can recover "those damages available for personal injury

under the law of the state in which the hospital is located." 42 U.S.C. § 1395dd(d)(2)(A).  In California, where a plaintiff seeks damages for violation of a statutory duty, the general rule of tort damages – that all detriment proximately caused by a breach of a duty is compensable – applies.  Pintor v. Ong, 211 Cal. App. 3d 837, 841-42 (1989).  This includes emotional distress damages.  Young v. Bank of America N.T. & S.A., 141 Cal. App. 3d 108, 126 (1983).

In order to recover damages for emotional distress where there is no physical injury, the injury suffered must be "severe" – that is, substantial or enduring, as distinguished from trivial or transitory.  Pintor, 211 Cal. App. 3d at 846; Young, 141 Cal. App. 3d at 114; see also Lee v. Bank of America, 218 Cal. App. 3d 914, 920-21 (1990) (while damages for emotional distress unaccompanied by physical injury may be awarded in a tort action, the injury suffered must be severe); Molien v. Kaiser Foundation Hospitals, 27 Cal. 3d 916, 927 (1980) (intentional torts will support an award of damages for emotional distress alone in cases involving "extreme and outrageous intentional invasions of one's mental and emotional tranquility").

Courts in California have described "severe" emotional distress as "emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it."  Girard v. Bell, 125 Cal. App. 3d 772, 787-88 (1981) (discussing meaning of "severe" emotional distress in context of claim of intentional infliction of emotional distress); Fletcher v. Western Nat'l Life Ins. Co., 10 Cal. App. 3d 376, 396-97 (1970) (same).

DMC argues that plaintiffs lack sufficient evidence to raise a triable issue with regard to whether Tommie Pugh suffered severe emotional distress as a result of DMC's alleged violation of EMTALA.  First, DMC notes that Mr. Pugh did not claim in his discovery responses that he suffered severe emotional distress.  For example, in his responses to interrogatories, when asked to state all facts supporting the EMTALA claim and to describe all injuries or damages suffered as a result of any wrongdoing by DMC, Mr. Pugh never asserted that he suffered any emotional distress related to the second encounter with

7

DMC. Instead, the responses focus on Mrs. Pugh's interaction with Dr. Johnson and the impact of that interaction upon her (not on Mr. Pugh).

DMC asserts further that the evidence shows that Mr. Pugh has no recollection whatever of the events that occurred when he and Mrs. Pugh returned to DMC after going home to retrieve the methadone. Thus, DMC argues, it is evident that Mr. Pugh cannot provide any testimony to corroborate a claim that he suffered emotional distress, let alone severe emotional distress. DMC contends that it would therefore be impossible to determine – even assuming that Mr. Pugh did suffer emotional distress – whether that emotional distress was the result of DMC's alleged violation of EMTALA (refusal to treat him at the emergency room), or whether it was instead related to his physical condition.

In addition, DMC argues, it is impossible to determine whether Mr. Pugh even heard or appreciated what transpired between Mrs. Pugh and Dr. Johnson on the second encounter at DMC, because he was in the Pughs' vehicle with the door closed, and is unable to recall anything of what was going on (thus cannot testify as to whether he heard the conversation or not). Thus, DMC contends, it would be improper to infer that Mr. Pugh suffered any emotional distress as a result of being turned away from DMC as alleged, and even if the court allowed such an inference, it would be impossible for plaintiffs to establish that such emotional distress was "severe," given the totality of the evidence available.

Because Mr. Pugh remained in the van throughout the second encounter, Mrs. Pugh is the only potential witness (other than Mr. Pugh himself) as to his possible emotional distress. DMC argues, however, that Mrs. Pugh's deposition testimony demonstrates that she will be unable to provide any evidence that her husband was suffering from emotional distress, let alone severe emotional distress, as a result of the alleged EMTALA violation.

DMC notes that Mrs. Pugh testified that Mr. Pugh remained in the passenger seat of their vehicle throughout the entire second encounter at DMC, and that following her encounter with Dr. Johnson, she returned to the vehicle and simply asked Mr. Pugh whether he wanted to go to Kaiser or Alta Bates. She did not testify to any additional conversation except as it related to which hospital Mr. Pugh would prefer. She also

testified that he was "not saying or doing anything" on the drive to Alta Bates, and that he "looked completely out of it" during the drive.

In addition, DMC contends, the Alta Bates records provide no evidence that Mr. Pugh was suffering from emotional distress following the Pughs' second visit to DMC. Specifically, DMC notes that the emergency admission note includes no indication whatsoever that Mr. Pugh was suffering from any form of emotional distress relating to the encounter at DMC – rather, the admitting physician simply noted that Mr. Pugh had some right-sided weakness and slurred speech.

In opposition, plaintiffs argue that there is relevant evidence from which a fact-finder might conclude that Tommie Pugh suffered from emotional distress. Plaintiffs accept DMC's recitation of the facts and supporting evidence, but assert that the evidence relating to Mrs. Pugh's testimony is incomplete because it relies solely on her deposition testimony. Plaintiffs note that Mrs. Pugh was never asked in her deposition for her recollection of the full conversation between herself and Mr. Pugh following her encounter with Dr. Johnson.

Plaintiffs assert that Mrs. Pugh's new declaration supports a finding that Mr. Pugh was conscious and coherent at the time that he was denied treatment at DMC, and also when they reached Alta Bates. Plaintiffs argue that under California law, the fact that Mr. Pugh was conscious and aware of events concerning the denial of admission to DMC's emergency room may be sufficient to create an inference that he suffered from severe emotional distress. In support, plaintiffs rely on Capelouto v. Kaiser Found. Hosp., 7 Cal. 3d 889 (1972), and on Duarte v. Zachariah, 23 Cal. App. 4th 1306A (1994).[1]

Based on these two cases, plaintiffs argue that under certain circumstances emotional distress damages may be inferred merely from the nature of the events and the harm that they may have caused to one either physically or psychically. Plaintiffs assert that there are "[s]ome events and circumstances from our common life experiences we

---

[1] The case citation provided by plaintiffs – Duarte v. Zachariah, 23 Cal. App. 4th 1306A (1994) – is not available on WestLaw, and no case with this citation appears in the bound volume of the California Appellate Reports. The only citation for this case that the court was able to locate is Duarte v. Zachariah, 22 Cal. App. 4th 1652 (1994).

9

know will likely cause extreme emotional distress and pain and suffering," and that where an event has taken place which "everyone would agree would cause severe emotional distress," and there is evidence that the person was conscious and aware the incident occurred, it can be presumed they suffered severe emotional distress.

Here, plaintiffs contend, it is undisputed that Mr. Pugh was having a stroke at the time Mrs. Pugh was attempting to have him admitted for the second time at DMC. Plaintiffs assert, however, that the fact that Mr. Pugh (as a result of his stroke) cannot recall these events now, does not mean that he did not suffer emotional distress in the minutes following the denial of his admission. For this reason, plaintiffs argue, the existence of triable issues precludes summary judgment.

The court finds that the motion must be GRANTED. Plaintiffs have provided no evidence that Mr. Pugh suffered severe emotional distress from the denial of treatment. The evidence shows that Mr. Pugh was in the Pughs' vehicle when his wife was arguing with Dr. Johnson during the second visit to DMC, and that he did not speak with Dr. Johnson on that occasion. Mrs. Pugh's declaration may support Mrs. Pugh's claim that she suffered emotional distress as a result of the encounter with Dr. Johnson, but it does not provide any evidence from which one could infer that Mr. Pugh suffered severe emotional distress as a result of DMC's denial of treatment.

Based on Mrs. Pugh's description of the discussion of whether to go to Kaiser or to Alta Bates, it seems clear that if Mr. Pugh had been experiencing emotional distress, he would have been able to articulate that in some observable way. However, as DMC notes, there is nothing in the history recounted by Mrs. Pugh that suggests that Mr. Pugh displayed any sign of emotional distress – whether by conduct or statement.

Thus, the only question is whether the evidence that Mr. Pugh was sufficiently conscious to "discuss" with Mrs. Pugh whether he wanted to go to Kaiser or Alta Bates, and that he was sufficiently conscious to discuss his symptoms with the admitting physician at Alta Bates, is enough to allow the case to go to the jury to decide whether to "infer" that Mr. Pugh suffered from severe emotional distress as a result of the denial of service.

The court finds no support for plaintiffs' position in either <u>Capelouto</u> or <u>Duarte</u>, neither of which provide any authority for the proposition that severe emotional distress can be inferred from an EMTALA violation without any direct evidence that the plaintiff actually suffered emotional distress.

<u>Capelouto</u> was a medical malpractice case based on an actual physical injury to the plaintiff, and the minor plaintiff was not seeking stand-alone emotional distress damages, but rather damages for pain and suffering that arose from her proven physical injury.  The <u>Capelouto</u> court's statement that a jury may infer physical pain and suffering from physical injury does not support plaintiff's attempt in the present case to argue that the jury can infer severe emotional distress from denial of service at a hospital where there is no evidence or proof that the denial of service cased any physical injury.

Similarly, <u>Duarte</u> – also a medical malpractice case – does not establish that a plaintiff can claim for severe emotional distress damages without physical injury.  Moreover, while it may be reasonable (as the <u>Duarte</u> court ruled) to infer that a person who has experienced a recurrence of cancer that cannot be treated because of bone marrow injury would suffer emotional distress as a result of that injury, the <u>Duarte</u> court nowhere stated in the opinion that severe emotional distress can be inferred in the complete absence of any physical injury.

A plaintiff in an EMTALA action can recover only for personal harm that he in fact did suffer.  <u>See</u> 42 U.S.C. § 1395dd(d)(2)(A).  Here, the only harm or injury claimed by Tommie Pugh is that he suffered severe emotional distress.  Just as in <u>Capelouto</u> where the plaintiff needed to prove that she contracted a disease, and just as in <u>Duarte</u>, where the plaintiff needed to prove that she suffered injury to her bone marrow, Mr. Pugh cannot  prevail unless he proves by direct evidence that he suffered severe emotional distress because he was denied service.  The existence of the injury cannot be inferred from the fact that he was denied service – even if he was aware of the denial of service at the time.

**CONCLUSION**

In accordance with the foregoing, DMC's motion for summary judgment is

11

GRANTED.

As Mrs. Pugh's claim for intentional infliction of emotional distress against Dr. Johnson remains for trial, the remaining parties shall meet and confer and then shall contact the courtroom deputy for the undersigned to schedule a further case management and trial setting conference to occur at the courthouse or telephonically.

**IT IS SO ORDERED.**

Dated: July 16, 2010

PHYLLIS J. HAMILTON
United States District Judge